IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED
JUL 09 2025
U.S. DISTRICT COURT
ELKINS WV 26241

| | |
|---|---|
| IN THE MATTER OF THE SEARCH WARRANT FOR HISTORICAL PRECISION LOCATION DATA, CALL DETAIL RECORDS, SUBSCRIBER INFORMATION, AND SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (424) 482-1616 | Case No. 1:25mj56 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Deputy United States Marshal W. Fred Frederick, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the historical precision location data of the cellular telephones assigned call number **(424) 482-1616**, whose service provider is **Verizon**, a wireless telephone service provider headquartered at **Verizon, Attn: VSAT, 180 Washington Valley Road, Bedminster, NJ 07921, vsat.cct@verizon.com.** The Target Cell Phone Number is described herein, and the information to be seized is described herein and in Attachment A.

2.  I have been employed by the United States Marshal Service (USMS) as a Deputy United States Marshal (DUSM) since December 10, 2009. I am a graduate of the United States Marshals Service (USMS) Training Academy and the Criminal Investigator Training Program at the Federal Law-Enforcement Training Academy in Glynco, GA. I have a Bachelor of Science Degree in Criminal Justice from Fairmont State University. My duties as a DUSM assigned to the Northern District of West Virginia ("N.D. W. Va.") include investigating, locating and

apprehending state and federal fugitives wanted for violations of state and federal law. I am currently assigned as the District Sex-Offender Investigations Coordinator for the USMS in the Northern District of West Virginia and, as such, my duties include investigating all persons required to register as a sex-offender in the United States to determine if they are in violation of the Sex Offender Registration and Notification Act ("SORNA") under 18 U.S.C.§ 2250. I completed the USMS Sex-Offender Investigations Coordinator Training Program on July 24, 2015, and the USMS Sex-Offender and Criminal Investigations Course on April 30, 2021.

3. Prior to being employed as a DUSM, I was employed as a Deputy Sheriff at the Marion County Sheriff's Department in West Virginia from February 1, 2000, through December 4, 2009. I am a graduate of the West Virginia State Police Academy and have also completed advanced training in criminal investigations that include Narcotics Investigations, Undercover Drug Investigations, Homicide Investigations, Clandestine Laboratory Investigations, Crime Scene Investigations, Forensic Evidence Collection and Latent Fingerprint Recovery, and Drug Diversion.

4. As a Deputy Sheriff, I was assigned as a detective with the Three Rivers Drug and Violent Crimes Taskforce for over six years and have investigated many cases involving drug use and distribution and violent crimes. I was also assigned to the USMS's Mountain State Fugitive Taskforce as a Task Force Officer from May 4, 2007 through December 4, 2009.

5. As a Deputy U.S. Marshal and as a Deputy Sheriff, I have obtained and executed search warrants, arrest warrants, and other court orders and provided testimony in both state and federal courts.

6. On many occasions, I have obtained cellular telephone call detail records and location data through state and federal search warrants and other court orders in relation to

criminal investigations. I have utilized multiple investigative techniques to search through call detail records and location data to identify cellular telephones utilized by fugitives to determine their locations and execute arrest warrants.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

8. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2250 have been committed by Sadie Ann KNOTTS-HUDSON and Danny Douglas HUDSON. There is also probable cause to believe that the location information described in Attachment A will constitute evidence of these criminal violations.

9. Based on the facts set forth in this affidavit, there is probable cause to believe that KNOTTS-HUDSON and HUDSON have violated 18 U.S.C. § 2250. KNOTTS-HUDSON and HUDSON are the subjects of a federal investigation in relation to this crime. There is also probable cause to believe that the location information described in Attachment A will assist law enforcement in proving the elements of the offense in this criminal investigation. Specifically, the data received will verify KNOTTS-HUDSON and HUDSON's location throughout the time span of their criminal conduct.

10. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is the United States District Court for the N.D. W. Va., a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

11. The United States, including the United States Marshals Service, is conducting a criminal investigation of Sadie Ann KNOTTS-HUDSON and Danny Douglas HUDSON, regarding possible SORNA violations.

12. Sadie A. KNOTTS-HUDSON was convicted of Use of a Minor to Film Sexually Explicit Conduct in the Circuit Court of Preston County, WV, on August 20, 2013. The victim in this case was a fifteen-year-old youth.

13. Danny Douglas HUDSON was convicted of Use of a Minor to Film Sexually Explicit Conduct in the Circuit Court of Preston County, WV, on October 3, 2013. The victim in this case was the same fifteen-year-old youth.

14. Based on this conviction, both KNOTTS-HUDSON and HUDSON have a lifetime requirement to register as a sex offender in WV. KNOTTS-HUDSON and HUDSON are married and were co-defendants in the Use of a Minor to Film Sexually Explicit Conduct in the Circuit Court of Preston County, WV.

15. KNOTTS-HUDSON was convicted of violations of SORNA on August 2, 2023, in the Central District of California ("C.D. Cal."), sentenced to eight months prison followed by supervised release ("SR") in C.D. Cal. HUDSON was convicted of violations of SORNA on August 2, 2023, in C.D. Cal., sentenced to 18 months in prison followed by SR in C.D. Cal. When they were arrested in C.D. Cal. on the SORNA charges, they were living together in Los Angeles, CA. After their release from Federal Prison, both had active federal arrest warrants issued from C.D. Cal. for violations of their SR, and their whereabouts were unknown. KNOTTS-HUDSON's warrant was issued on October 27, 2023, and HUDSON's warrant was issued on June 4, 2024.

16. On February 26, 2025, C.D. Cal. DSOC/DUSM Luna sent a collateral lead to N.D. W. Va. USMS, requesting assistance in locating and apprehending Danny Douglas HUDSON. The collateral lead was assigned to DUSM Laliberte, who opened a preliminary SORNA investigation on HUDSON. On June 25, 2025, DUSM Laliberte notified me that his investigation revealed a possible address for Sadie KNOTTS-HUDSON in Morgantown, WV.

17. On June 26, 2025, I opened a SORNA investigation on Sadie A. KNOTTS-HUDSON. I was already familiar with KNOTTS-HUDSON and HUDSON because I had previously investigated them in 2022.

18. On June 27, 2025, TFO Arnold (WV State Parole) and I located and arrested Sadie Ann KNOTTS-HUDSON at the possible address in Morgantown, WV. The homeowner, Ronald Donaldson II, advised that Sadie Ann KNOTTS-HUDSON had been living at the residence since approximately February 2025 when she and Danny Douglas HUDSON had traveled from California to West Virginia by bus. Donaldson II and KNOTTS-HUDSON advised that Danny Douglas HUDSON had also lived at the residence since around February 2025 until he was arrested by local police and was lodged at the North Central Regional Jail (NCRJ). KNOTTS-HUDSON told us that HUDSON gave the police a fictitious name, "James Miller," at time of his arrest.

19. I contacted the NCRJ and confirmed that Danny Douglas HUDSON had been arrested by Westover Police on May 5, 2025, for public intoxication, obstructing an officer, and refusing to fingerprint (Monongalia County Magistrate Court Case # 25M-31M-1141) and had been booked in at their facility under a fictitious name, "James Michael Vincent Miller." TFO Arnold searched the WV OIS Inmate Search website and found a photo of "James Michael Vincent Miller." I positively identified the person in the photo as Danny Douglas HUDSON. I

5

showed the photo to KNOTTS-HUDSON, and she also positively identified him as Danny Douglas HUDSON. I advised the NCRJ booking staff that the subject's real name was Danny Douglas HUDSON and that he had an outstanding C.D. Cal. federal arrest warrant. A federal detainer was lodged against HUDSON for SR violations.

20. DUSM Walker and I interviewed Danny Douglas HUDSON at NCRJ. The interview was recorded by both video and audio. I read him the *Miranda* Warning from a USM-309 Form (Waiver of Rights). He signed the form acknowledging that he understood his rights, waived his rights to an attorney, and agreed to answer questions without an attorney present.

21. HUDSON stated that he was arrested on May 5, 2025, by Westover Police for refusing to fingerprint, obstructing an officer, and public intoxication. He admitted that he had given the police a false name, "James Miller."

22. HUDSON stated that he and his wife, KNOTTS-HUDSON, were convicted of a sex crime, conspiracy to use minors to film sexually explicit content, in Preston County, WV. HUDSON stated that he was sentenced to probation and later violated his probation and was sent to prison. HUDSON stated that after his release from prison, he was required to register as a sex offender, and he did register as a sex offender for a while in the State of WV.

23. HUDSON stated that he and KNOTTS-HUDSON had moved to California around 2022 and were both arrested and convicted of violating federal law for failure to register. He stated that he served 15 months in prison, and Sadie served eight months in prison.

24. HUDSON stated that he was released from Victorville Federal Prison on May 25, 2024. After his release, he and KNOTTS-HUDSON resided together in San Pedro, CA, and he did not register as a sex offender in California or check-in with his federal probation officer.

6

25. HUDSON stated that he did not know if KNOTTS-HUDSON had ever registered as a sex offender in California or checked-in with her federal probation officer.

26. HUSDON stated that on February 6, 2025, he and KNOTTS-HUDSON traveled from Los Angeles, CA, to Morgantown, WV, by Greyhound Bus. The bus trip took around three days, and he believes that they arrived in Morgantown, WV, on February 9, 2025. HUDSON stated that he could not remember if they had purchased the bus tickets in their actual names or not.

27. HUDSON stated that Ron Donaldson II, his current landlord, picked HUDSON and KNOTTS-HUDSON up in Westover and drove them to Donaldson's house in Morgantown, WV, where HUDSON and KNOTTS-HUDSON resided continuously in a little building in his front yard until HUDSON's arrest in May 2025.

28. HUDSON stated that he did not have a cellphone, but KNOTTS-HUDSON did, and he provided her cellphone number, (424) 482-1616. HUDSON stated that he believes she brought this cellphone with her from California.

29. I asked HUDSON if he had registered as a sex offender in the State of WV since he had returned and he stated that he had not.

30. I asked HUDSON if he had given the Westover Police a false name and had refused to be fingerprinted because he knew he was knew he was wanted, and he responded, "Absolutely." HUDSON stated that he had called KNOTTS-HUDSON's cellphone earlier today and Ron Donaldson II had answered her phone and told him that Sadie had been arrested.

31. I asked HUDSON if he knew that he was required to register as a sex offender in any state where he resides, and he stated that he knew he was required to do so.

7

32. A preliminary search of bus tickets purchased through Greyhound Lines/Flixbus showed bus tickets purchased in the names of "James Miller" and "Robin Miller" (Greyhound Booking Number 322-997-0766) departing Pittsburgh, PA, on February 9, 2025, at 10:30 AM and arriving in Morgantown, WV, on February 9, 2025, at 1:20 PM. Greyhound Lines/Flixbus has also located bus tickets purchased in the names of "James Miller" and "Robin Miller" (Greyhound Booking Number Number 322-878-3964) on February 6, 2025, departing Los Angeles, California, and arriving in Pittsburgh, Pennsylvania.

33. On June 30, 2025, I emailed the WV State Police Sex-Offender Registry to ask if either KNOTTS-HUDSON or HUDSON had registered as sex offenders anywhere in the State of WV in 2025. They advised that there was no record of KNOTTS-HUSDON or HUDSON being currently registered as sex offenders in the State of WV.

34. On July 7, 2025, I emailed WV Regional Jail Investigator Frisby, requesting that he provide all outgoing telephone numbers that inmate Danny Douglas HUDSON (Inmate Number 3510264) and inmate "James MILLER" (Inmate Number 3705322) made from NCRJ from May 5, 2025 through current date. Investigator Frisby emailed me the Viopath Detail Report, which shows that HUDSON had called telephone number (424) 482-1616, 561 times within the time frame.

35. I confirmed that Verizon is the cellular service provider for telephone number (424) 482-1616.

36. In my training and experience, I have learned that **Verizon** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911

8

Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

37. Based on my training and experience, I know that **Verizon** can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on **Verizon's** network or with such other reference points as may be reasonably available.

38. Based on my training and experience, I know that **Verizon** can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as **Verizon** typically collect and retain

9

cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

39. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

40.

41. I further request that the Court direct **Verizon** to disclose to the government any information described in Attachment A that is within the possession, custody, or control of **Verizon**. I also request that the Court direct **Verizon** to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment A unobtrusively and with a minimum of interference with **Verizon's** services, including by initiating a signal to determine the location of the Target Cell Phone on **Verizon's** network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate **Verizon** for reasonable expenses incurred in furnishing such facilities or assistance.

42. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

Respectfully submitted,

_W. Fred Frederick_
Deputy United States Marshal
United States Marshals Service

Subscribed and sworn to before me on July __9th__, 2025

_____
UNITED STATES MAGISTRATE JUDGE
MICHAEL JOHN ALOI

# ATTACHMENT A

Property to be seized: The records and assistance being sought subject to this search-warrant are enumerated below:

Description of Premises:    Verizon
Attn: VSAT
180 Washington Valley Road
Bedminster, NJ 07921
vsat.cct@verizon.com

Date range of search-warrant requested: May 1, 2025 through June 27, 2025.

Telephone Number: 424-482-1616

1. Cell Site activations, to include sector information for beginning and termination of all calls, related to all transmitted communication requested in this search-warrant;

2. Numbers transmitted to and from, including phone calls, SMS, MMS, and any other data transmission, and direct connections, if applicable;

3. Date, time, and duration of all transmitted communication;

4. Signaling information;

5. Subscriber, MIN/ESN, IMEI, IMSI, MSID and billing/payment information for the specified cellular/wireless telephone and/or device, to include and Customer Account Notes associated with the account;

6. Subscriber, MIN/ESN, IMSI, IMEI, MSID and billing/payment information for any other cellular-wireless telephones and/or devices on this account;

7. Wireless, Internet usage and IP connection records to include any IP addresses assigned to this account's device(s), logon dates and times and length of session, the IP address assigned to each session and any known domain names and any related cell site information;

8. Records and assistance requested in this order shall be provided to any agent of the United States Marshals Service, or their lawful designee, upon request;

9. It is further ordered that all subscriber information, call detail records, data transmission records, wireless Internet usage, and IP connection records be provided

in an electronic format specified by any agent of the United States Marshals Service, the West Virginia State Police, or their lawful designee, upon request;

10. An engineering map, showing all cell-site tower locations/addresses, sectors, orientations and horizontal beam width; including the physical address/location of all cellular towers in the specified market;

11. Any historical cell site information as it pertains to Wireless Internet/Data Usage;

12. Range to Tower (RTT), Per Call Measurement Data (PCMD), Timing Advance/TDOA, and or NELOS reports;

13. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the Target Cellular Device's location, even if it is located inside a house, apartment, or other building.

14. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.